UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AURORA MEMORY CARE, LLC, | ) | No. 18 B 11289 |
| | ) | |
| Debtor. | ) | Judge Goldgar |

## MEMORANDUM OPINION

Before the court for ruling is the motion of creditor West Suburban Bank (the "Bank") to convert or dismiss the chapter 11 case of debtor Aurora Memory Care, LLC ("AMC") under section 1112(b) of the Bankruptcy Code, 11 U.S.C. § 1112(b). For the reasons discussed below, the motion will be granted. Although the Bank prefers dismissal, the case will be converted to chapter 7.

### 1. Background

The facts are drawn from the parties' papers; other materials on the docket of the bankruptcy case; materials on the docket in a related and now-dismissed adversary proceeding, *Aurora Memory Care, LLC v. West Suburban Bank*, No. 18 A 183; and materials on the district court's docket in *U.S. Securities & Exchange Comm'n v. Kameli*, No. 17 C 4686. No facts are in dispute. Because no party has requested a formal evidentiary hearing, and because all the relevant facts are before the court and are familiar, no evidentiary hearing is necessary. *In re Bartle*, 560 F.3d 724, 729 (7th Cir. 2009).

AMC operates a health care facility in Aurora, Illinois. The 100% owner of AMC is Aurora Real Estate and Property Investments, LLC ("ARE") which is itself a debtor in a chapter 11 case, *In re Aurora Real Estate & Property Invs., LLC*, No. 18 B 16030. Taher Kameli, a

Chicago immigration lawyer, owns 100% of ARE.

AMC is one of several health care facilities in Illinois and Florida with which Kameli is involved. These facilities, or more specifically the investment funds Kameli established in connection with them, have served as investment vehicles for foreign nationals interested in gaining U.S. citizenship though the U.S. Citizenship and Immigration Service's EB-5 Program. Created under the Immigration Act of 1990, the EB-5 Program extends citizenship to immigrants who invest in designated U.S. businesses that create a certain number of jobs.

Kameli's investment scheme has not sat well with the federal government. In April 2017, the SEC brought a civil enforcement action (the "SEC action") against Kameli and others alleging that the handling of the investment funds violated the Securities Act of 1933 and the Securities Exchange Act of 1934. AMC was named in the action as a "relief defendant," meaning that it was not accused of any wrongdoing but was joined to have it disgorge monies received as a result of the wrongdoing of other defendants. *See, e.g., Holzhueter v. Groth (In re Holzhueter)*, 575 B.R. 444, 449 (Bankr. W.D. Wis. 2017). In September 2017, the district court denied the SEC's motion for a preliminary injunction to bar Kameli from further violations of the securities laws and further involvement with EB-5 investments. *See S.E.C. v. Kameli*, 276 F. Supp. 3d 852 (N.D. Ill. 2017). The defendants have since moved to dismiss the SEC's complaint. Those motions are pending.

Foreign investment was not the only one source of AMC's funding. In 2015, the Bank loaned AMC $6.5 million. The loan was secured by a mortgage on AMC's property as well as pledges of ARE's ownership interest in AMC and Kameli's ownership interest in ARE. Kameli also personally guaranteed the loan.

The loan matured on December 1, 2016. When AMC failed to repay it on the maturity

date, the Bank filed an action in Illinois state court to foreclose on the mortgage and recover on the note. The complaint also included a claim for replevin seeking to recover Kameli's interest in ARE and ARE's interest in AMC. Within days of the action's filing, the state court appointed a receiver who assumed responsibility for the property. At some point, the Bank moved for partial summary judgment on its complaint, and the state court set the motion for ruling on April 27, 2017.[1]

On April 18, before the state court could rule on the motion, a creditor of AMC, Meridian Senior Living, LLC, filed an involuntary chapter 11 petition against AMC. The Bank moved under section 543(d)(1) of the Code, 11 U.S.C. § 543(d)(1), to have the receiver excused from his obligation to turn over the property, and the motion was granted. The receiver has remained in possession of the property.

For reasons that have never been clear, petitioning creditor Meridian waited until May 9 to have a summons issued to AMC. Rather than contest the petition, though, on June 4 AMC consented to the entry of an order for relief, and an order for relief was entered the next day. Since then, the case has proceeded as a voluntary case under chapter 11.

AMC's list of creditors and other entities was due on June 12, and its schedules, statement of financial affairs, and other documents were due on June 19. *See* 11 U.S.C. §

---

[1] Because the replevin claim was directed at Kameli, the automatic stay did not affect the claim, and on June 5 the state court awarded the Bank judgment on it. The day before, ARE filed its own chapter 11 petition, staying the Bank's efforts to sell Kameli's ownership interest in ARE and ARE's ownership interest in AMC. The adversary proceeding, *Aurora Memory Care, LLC v. West Suburban Bank*, No. 18 A 183, was filed in an effort to bar the Bank from selling those interests. AMC voluntarily dismissed the adversary proceeding after the parties agreed that the automatic stay prevented the sale. *See In re Country Estates Nursing Home, Inc.*, 268 B.R. 316, 320-21 (Bankr. D. Mass. 2001) (citing *In re Marvel Entm't Grp., Inc.*, 209 B.R. 832, 839 (Bankr. D. Del. 1997)).

521(a)(1); Fed. R. Bankr. P. 1007(a)(2), (c). AMC failed to file any of these materials on time, prompting the U.S. Trustee to move to convert or dismiss the case. The SEC joined in the motion.

AMC eventually filed partial schedules on July 23, several days late. AMC filed its list of creditors the next day, more than a month late. The remaining schedules and amended versions of the earlier schedules were not filed until August 7, two months after the order for relief was entered. The statement of financial affairs was not filed until August 22. A set of amended schedules was filed the same day. (After the amended schedules were filed, the U.S. Trustee withdrew its motion.)

The schedules AMC filed raise questions about the value of its facility, questions that have never been answered adequately. The Schedule D filed on July 23 listed the facility's value as $10 million. The amended Schedules A/B and D filed on August 22, on the other hand, listed the value as $16 million. According to the amended schedules, the new value was based on an "appraisal." AMC has mentioned the appraisal several times in the course of the case, but it has never been produced.[2]

AMC's schedules (as amended on August 22) disclosed $8.561 million in secured debt, $8.4 million of it owed to the Bank. The schedules also disclosed $13.206 million in unsecured debt. Of that amount, the vast majority, more than $12 million, is owed to entities connected with Kameli: Chicagoland Foreign Investment Group, Bright Oaks Development, Aurora

---

[2] According to the Bank, Kameli testified at the meeting of creditors that he knew of no such appraisal. But the Bank has not produced a transcript of the meeting. Nor has the Bank submitted an appraisal of its own. At his deposition in the adversary proceeding, Kameli said in passing that the value of the property was "over $16 million." (Mot. Ex. 6, Dep. at 69). But he did not explain where that value came from, and he was not pressed on the point.

Assisted Living EB-5 Fund LLC, and others. Another $214,478 is owed to Kameli personally and to his law firms (he appears to have two).

To date, AMC has filed no monthly operating reports in the case, as sections 1106(a)(1) and 704(a)(8) require. 11 U.S.C. §§ 1106(a)(1), 704(a)(8).

AMC also has yet to propose a plan. AMC's intention (reflected in, among other places, Kameli's deposition testimony in the adversary proceeding) is to obtain post-petition financing in an amount sufficient both to pay the Bank and allow for continued operations.[3] AMC has maintained since the petition date that it has secured $10 million in financing (or more recently "up to $10 million" (Resp. at 3)) from T2 Capital Management, and AMC produced a letter of intent from T2.

The T2 letter of intent has several contingencies, one of which is the dismissal of AMC with prejudice as a party to the SEC action. Kameli testified at his deposition that he had discussed the dismissal idea with the SEC's attorneys and reached an agreement on the subject back in April. Under the agreement, AMC and its related fund would be dismissed as parties

---

[3] Kameli testified:

Q: Can you tell me what . . . is . . . your successful plan for reorganization of Aurora Memory Care?

A: Sure. Obtaining a loan from a lender to pay West Suburban Bank and the lienholders right now and hopefully to have enough money for some operation also. That's it.

(Dep. at 32). Later, he testified:

Q: And the plan of reorganization is simply refinancing, correct?

A: It's very simple. Refinancing.

(*Id.* at 80).

with prejudice, but if AMC's financing fell through, the SEC would be able to rejoin them. (Dep. 39-40). According to Kameli, the agreement required approval from the SEC in Washington, but he believed he would have that approval "in the next few months." (*Id.* at 41). That was on July 6, more than three months after the supposed agreement with the SEC's attorneys.

Two months later, on September 17, AMC moved to lift the automatic stay to allow it to "take action, including the filing of motions, in the SEC litigation, to bring the case to a conclusion and to resolve the claim of the SEC against it." The motion said that AMC had "been in discussions with the SEC for months in an attempt to resolve the SEC claims against it, but to date no final decision [had] been made by the SEC regarding a resolution."[4]

Kameli conceded at his deposition that even the T2 financing would not be enough for AMC to make a go of it. In addition, he testified, AMC would need to "increase[ ] the number of occupants to support the debt." (Dep. at 51). As of May 14, 2018, AMC had 44 residents, up from 22 when the receiver was appointed. Kameli estimated that the facility would need to increase occupancy to "54, 55 residents" to generate enough cash for debt service. Servicing the T2 debt, Kameli estimated, would take "70 to $80,000" each month. (*Id.* at 50).

---

[4] In a written response, the SEC declared that it had "no idea what Debtor's Counsel intends to file in the SEC Enforcement Action to 'bring the case to a conclusion and resolve the case against it.'" The motion was denied as unnecessary as to AMC (since the stay does not prevent a debtor from defending an action against it) and denied for lack of standing as to the SEC. *See In re Sweports, Ltd.*, 476 B.R. 540, 544 (Bankr. N.D. Ill. 2012) (holding that a debtor lacks standing to assert a creditor's rights and have the stay modified to permit the creditor to pursue its claims). Still, the SEC's point was a fair one. According to the district court's docket, AMC and the other relief defendants moved to dismiss the SEC's complaint last March. The motion is fully briefed and under advisement. AMC did not explain what it intended to file in the SEC action, and indeed it is unclear what else AMC could file at this point to "resolve the claim against it."

According to the receiver, however, full occupancy of 60 residents would give AMC annual total revenue of $3,659,307 and annual net operating income of $554,000. (Mot. Ex. 8, Aff. of M. Flanagan, Ex. B). And that figure does not take into account real estate taxes on the property. (*Id.* ¶ 9). Each installment of the 2017 real estate taxes (the first due in June 2018, the second due in September 2018) is $117,027, or a total of $234,054. (*Id.* ¶ 10). Subtracting that sum from annual net operating income would leave only $319,946, or $26,662 each month, for debt service.

The Bank now moves under section 1112(b) to convert or dismiss AMC's case. As "cause" for conversion or dismissal, the Bank asserts that AMC has no reasonable likelihood of confirming a plan. The Bank adds that AMC has filed no monthly operating reports in the case. The Bank asks for dismissal rather than conversion to chapter 7. AMC opposes the motion.

## 2. Discussion

The Bank's motion will be granted. The Bank has shown cause to convert or dismiss the case, and AMC has not shown unusual circumstances warranting the case's continuation, let alone any of the other statutory exceptions. Dismissal or conversion is therefore mandatory. Given the uncertainty about the facility's value, however, the case will not be dismissed but will be converted to chapter 7.

### a. Statutory Framework

Section 1112(b) of the Code provides for the conversion or dismissal of a chapter 11 case on motion of a party in interest. Before Congress amended the Code in 2005, conversion or dismissal under section 1112(b) was a matter left mostly to the court's discretion. Since 2005, however, that discretion has been curtailed; conversion or dismissal is now mandatory if the

movant meets its burden of proof. *See In re Domiano*, 442 B.R. 97, 104-05 (Bankr. M.D. Pa. 2010); *In re Dovetail, Inc.*, No. 07 B 72820, 2008 WL 5644889, at *3 (Bankr. N.D. Ill. Dec. 31, 2008). The amended section 1112(b) also introduced a burden-shifting scheme under which the debtor can resist an otherwise mandatory conversion or dismissal. *See* 11 U.S.C. § 1112(b)(2); *see generally In re Orbit Petroleum, Inc.*, 395 B.R. 145, 147-49 (Bankr. D.N.M. 2008).

Under the revised section 1112(b)(1), the court must convert a case to chapter 7 or dismiss the case if there is "cause" to do so. 11 U.S.C. § 1112(b)(1). "Cause" is defined in section 1112(b)(4) with a list of examples, but the list is not exclusive. *In re Waterworks, Inc.*, 538 B.R. 445, 457-58 (Bankr. N.D. Ill. 2015); *Orbit Petroleum*, 395 B.R. at 147-48. The initial burden lies with the movant to demonstrate "cause." *In re Draiman*, 450 B.R. 777, 826 (Bankr. N.D. Ill. 2011); *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007).

Once the movant shows cause, the burden shifts to the debtor to establish the exceptions in section 1112(b)(2). *Waterworks*, 538 B.R. at 457; *In re Ramreddy, Inc.*, 440 B.R. 103, 112-13 (Bankr. E.D. Pa. 2009). First, the debtor must specifically identify "unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(2). The Code does not define "unusual circumstances," but the phrase "contemplates conditions that are not common in most chapter 11 cases." *In re Wallace*, No. 09-20496-TLM, 2010 WL 378351, at *7 (Bankr. D. Idaho Jan. 26, 2010) (internal quotation omitted), *aff'd*, No. 2:10-CV-113-BLW, 2011 WL 1230535 (D. Idaho Mar. 30, 2011); *see also In re Korn*, 523 B.R. 453, 468 (Bankr. E.D. Pa. 2014); *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009).

Second, the debtor must demonstrate (1) that a plan is reasonably likely to be confirmed within the statutorily required time, 11 U.S.C. § 1121(b)(2)(A); and (2) that the debtor had a

"reasonable justification" for the act or omission constituting "cause" for conversion or dismissal, and the act or omission will be cured within a "reasonable time," 11 U.S.C. § 1121(b)(2)(B) (i), (ii). *See In re Grasso*, 497 B.R. 448, 457-58 (Bankr. E.D. Pa. 2013), *aff'd sub nom. Grasso v. Madison Capital, Co.*, No. 13-4308, 2014 WL 1281123 (E.D. Pa. 2014); *LG Motors*, 422 B.R. at 116; *Ramreddy*, 440 B.R. at 112-13; *Orbit Petroleum*, 395 B.R. at 148.[5]

Whether to dismiss or convert a case under section 1112(b) remains a decision committed to the discretion of the bankruptcy court. *Bartle*, 560 F.3d at 730.

### b. Cause

"Cause" exists to convert or dismiss this case for two reasons: (1) AMC has filed no monthly operating reports, and (2) AMC has no reasonable likelihood of confirming a plan. Each separately constitutes "cause" to convert or dismiss the case.

### i. No Monthly Operating Reports

First, the Bank has shown that AMC has failed to "satisfy timely" a "filing or reporting requirement" under the Code, *see* 11 U.S.C. § 1112(b)(4)(F), specifically the requirement that a chapter 11 debtor file accurate operating reports by the 15th day of each month. *See In re 210 W. Liberty Holdings, LLC*, No. 08-677, 2009 WL 1522047, at *7 (Bankr. N.D. W. Va. May 29, 2009). With exceptions not relevant here, section 1107(a) requires a chapter 11 debtor in

---

[5] After the 2005 amendments to the Code, some courts read the exceptions in section 1112(b)(2) disjunctively, so that a debtor could avoid dismissal or conversion by showing *either* unusual circumstances *or* the reasonable likelihood of a confirmable plan as well as a reasonable justification for the act or omission constituting "cause." *See, e.g., In re Park*, 436 B.R. 811, 815 (Bankr. W.D. Va. 2011). But the Bankruptcy Technical Corrections Act of 2010, Pub. L. No. 111-327, 124 Stat. 3557 (eff. Dec. 22, 2010), amended the statute to list the exceptions conjunctively, *see id.* at § (2)(a)(33), 124 Stat. at 3561. Under the current version of section 1112(b)(2), each of the exceptions must be satisfied.

-9-

possession to perform the duties of a chapter 11 trustee. 11 U.S.C. § 1107(a). Section 1106(a)(1) specifies that those duties include a chapter 7 trustee's duties under section 704(a)(8). 11 U.S.C. § 1106(a)(1). Section 704(a)(8), in turn, requires a trustee to file with the court "periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires." 11 U.S.C. § 704(a)(8). The U.S. Trustee for this region requires monthly operating reports. *See* https://www.justice.gov/ust-regions-r08/file/ch11_guidelines.pdf/download (last visited Sept. 27, 2018).

Monthly operating reports "are much more than busy work imposed upon a Chapter 11 debtor for no reason other than to require it do something." *In re Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991). They are "the life blood" of chapter 11, enabling creditors to keep tabs on the debtor's post-petition operations. *Id.*; *see also 210 W. Liberty Holdings*, 2009 WL 1522047, at *7. Failure to file accurate and timely reports undermines the chapter 11 process and is considered a serious breach of a debtor's fiduciary obligations to creditors. *In re Rey*, Nos. 04 B 35040, 04 B 22548, 06 B 4487, 2006 WL 2457435, at *8 (Bankr. N.D. Ill. Aug. 21, 2006); *see also Gateway*, 374 B.R. at 565 (noting that a debtor has a duty to keep the court and creditors "informed about the status and condition of its business").

In this case, AMC has filed no operating reports, even though the order for relief was entered nearly four months ago. The Bank points out the omission in its motion, and in response AMC acknowledges the Bank's point (*see* Resp. at 2). What AMC does not do is offer any excuse for its omission (let alone a "reasonable" one, as the statute requires). Nor does AMC suggest the problem can be rectified in a reasonable time. AMC notes the problem and then says nothing.

AMC does say that it was unable to file schedules and other required documents in a timely fashion partly because the receiver was excused from turning over the facility. It may be that AMC would offer the same excuse for its failure to file monthly operating reports. But that excuse would be unavailing. Nothing in the Code exempts a chapter 11 debtor from its duties under section 1106 when a prepetition custodian is excused from compliance with section 543(b), *see Woodale Props., Ltd. v. American Chtd. Bank*, No. 16 C 7026, 2017 WL 736892, at *5 (N.D. Ill. Feb. 24, 2017) (affirming dismissal where the bankruptcy court rejected the debtor's attempt to use the receiver's possession of the property as an excuse for failing to file a single operating report), any more than the Code imposes the duties of a trustee on a prepetition custodian because he happens to remain in possession of property, *see In re 400 Madison Ave. L.P.*, 213 B.R. 888, 894 (Bankr. S.D.N.Y. 1997).[6]

It was incumbent upon AMC to file operating reports. No reports have been filed. The unexcused failure to file monthly operating reports is "cause" warranting conversion or dismissal. *See In re All Denominational New Church*, 268 B.R. 536, 538 (B.A.P. 8th Cir. 2001) ("A failure to file monthly operating reports, whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of the Chapter 11 proceeding."); *210 W. Liberty Holdings*, 2009 WL 1522047, at *7.

---

[6] In *In re Attack Props., LLC*, 478 B.R. 337 (N.D. Ill. 2012), the court concluded – in dicta, since the dismissal of the underlying chapter 11 case was affirmed – that a debtor's failure to file monthly operating reports is not cause for dismissal when a receiver has custody of the property. *Id.* at 342-43. The court reached that conclusion, however, because section 704(a)(8) requires the reports "if the business of the debtor is authorized to be operated," 11 U.S.C. § 704(a)(8), and the record showed that the debtor in question was "not an operating business." *Attack Props.*, 478 B.R. at 342-43 (internal quotation omitted). AMC, by contrast, is an operating business. If AMC has no obligation to submit monthly operating reports to keep the court and creditors apprised of its operations, no one does, since the receiver (who reports to the state court and is not subject to this court's jurisdiction) certainly does not.

### ii. No Reasonable Likelihood of Reorganization

Second, the Bank has shown that AMC has no reasonable likelihood of successfully confirming a plan of reorganization.

Before the 2005 amendments to the Code, section 1112(b)(2) specifically listed the "inability to effectuate a plan" as "cause" to convert or dismiss a chapter 11 case. *See* 11 U.S.C. § 1112(b)(2) (2000). It was therefore proper to dismiss a case "if the court determine[d] that it [was] unreasonable to expect that a plan [could] be confirmed." *In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994). Although this example of cause was deleted from the statute in 2005, a debtor's "inability to effectuate a plan" continues to be "a viable basis for dismissal because the listed examples of cause are not exhaustive." *In re DCNC N.C. I, L.L.C.*, Nos. 09-3775, 09-3776, 2009 WL 3209728, at *5 (E.D. Pa. Oct. 5, 2009); *see also Bartle*, 560 F.3d at 730 (citing *Woodbrook* in a post-2005 case and noting that "[d]ismissal is appropriate if it is unreasonable to expect that a reorganization plan can be confirmed").

One requirement for confirming a plan is that the debtor demonstrate "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ." 11 U.S.C. § 1129(a)(11). This is known as the "feasibility" requirement. *In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 169 (Bankr. N.D. Ill. 2012); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005), *aff'd*, 2008 WL 4379035 (N.D. Ill. Mar. 24, 2008). To demonstrate feasibility, a debtor need not guarantee the plan's success, but the debtor must give a "reasonable assurance of commercial viability." *Repurchase Corp.*, 332 B.R. at 342 (internal quotation omitted); *see also In re STC, Inc.*, No. 14-41014, 2016 WL 3884799, at *10 (Bankr. S.D. Ill. Apr. 7, 2016); *Olde Prairie*, 467 B.R. at 169.

AMC has not made that showing. The reorganization AMC proposes – indeed, the only one it has ever mentioned – entails refinancing its $8.4 million debt to the Bank. But AMC has no financing currently available and has shown no prospect of obtaining any. AMC claims in its response to the Bank's motion that it has "secured financing through T2 Investments." (Resp. at 2). As evidence, AMC attaches T2's March 28 letter of intent. The letter, though, declared that it was "presented for discussion purposes only and does not constitute an offer, agreement, or commitment to lend." At most, then, T2 expressed an interest in discussing a loan. T2 made no financing commitment. AMC has produced no financing commitment from T2 or anyone else.

What is more, T2's loan proposal has long since expired. In its letter, T2 spelled out in some detail the terms of the loan it was prepared to make. Those terms included a closing date "no later than April 13, 2018." That date passed more than five months ago. AMC nonetheless maintains the T2 financing is still available, and as evidence of T2's supposed continued interest AMC submits another letter, this one from an entity called Hyve Capital which apparently serves as AMC's broker.[2] The Hyve letter declares: "We have been reassured that T2 Investments has completed the majority of due diligence and will be prepared to close on the $10MM credit facility . . . ." But Hyve does not explain the basis for that conclusion, and its letter is dated May 31, 2018, more than four months ago. AMC offers no evidence that financing from T2 remains a possibility today.

Even if T2 were still interested in lending on the terms in its April letter, the letter laid out several conditions to financing that AMC cannot meet. One was that "[AMC] shall have been dismissed with prejudice and all claims against the property shall have been forever waived and

---

[2] AMC mentions the Hyve letter but fails to submit the letter with its response. A copy is attached to AMC's motion for preliminary injunction in the adversary proceeding.

released from [the SEC action]." To date, though, AMC remains a defendant in the SEC action. Kameli insisted at his deposition that in April AMC had reached an agreement with the SEC's attorneys to have AMC dismissed as a party with prejudice; AMC was waiting only on Washington's approval of the agreement. But AMC offers nothing to corroborate Kameli's testimony – no correspondence between AMC and the SEC, nothing in writing representing so much as a draft of the agreement. The SEC (which has appeared in this case) has not confirmed such an agreement or, for that matter, that one has been discussed.[8] Even if there is such an agreement, Washington has not approved it, as AMC admits.

In addition to dismissal from the SEC action, T2 required as conditions to closing that AMC pay "up-front points" of $200,000 at closing and a six-month "interest reserve" at closing. The interest reserve aside, AMC has no ability to pay the "up-front points," since its amended Schedule A/B shows it has only $35,598 in cash on hand, nowhere close to the $200,000 it would need.

And assuming the loan did close, AMC has not explained how it could pay off the $10 million principal by the two-year maturity date – or pay the minimum $1 million in interest T2 required or the "deferred points" of 1.5% of the loan balance outstanding (or $150,000). In fact, the record shows that AMC would be unable to service the debt even with its facility at full occupancy. At his deposition, Kameli estimated that the monthly debt service would be somewhere in the region of $70-80,000. According to the receiver, however, at full occupancy

---

[8] The SEC's actions in this bankruptcy case and the tone it has taken tend to suggest otherwise. When the U.S. Trustee moved to dismiss or convert the case, the SEC did not sit on the sidelines but instead joined the motion. More recently, the SEC opposed AMC's motion to lift the stay to bring the SEC action against it "to a conclusion." The SEC said that it had "no idea" how AMC could accomplish that end and characterized the motion as "a waste of judicial resources and the parties' time and expense."

AMC would generate annual operating income (net of all expenses, including substantial real estate taxes) of $319,946, or just $26,662 per month. At peak operation, in other words, AMC's net monthly income would leave it more than $40,000 short of the amount needed to service the T2 debt.

To these financial obstacles AMC has no answer. AMC cites gross revenue figures from past reports the receiver made to the state court. (Resp. at 3). But those figures concern gross revenue, not net revenue. What matters is the money AMC would have left over for debt service. AMC also notes that the facility is operating at 66% capacity and says that increasing capacity to 100% would "increase revenue." (*Id.*). Undoubtedly. But AMC does not show that the increased revenue would be enough to service the proposed T2 debt.

AMC then asserts that a "recent appraisal" shows the facility to be worth $16 million, far more than the Bank's debt. (*Id.*). The relevance of the mysterious appraisal (which has been mentioned but never produced) is unclear. Even if the Bank is indeed protected by a "substantial equity cushion," as AMC asserts, the Bank wants the case dismissed, not the stay lifted (when questions of equity can be relevant, *see* 11 U.S.C. § 362(d)(2)(A)).

Confirmation cannot be based on "speculation" or "visionary projections" of a plan's success. *Repurchase Corp.*, 332 B.R. at 343. When a plan depends on post-petition financing, as AMC's does, it is not possible to satisfy the feasibility requirement in section 1129 without "evidence of a firm commitment of financing." *In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993); *see also In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 173 n.8 (5th Cir. 2011). "Optimistic but hollow declarations from [a debtor's principal] about hopes for funding" do not do the job. *Repurchase Corp.*, 332 B.R. at 343. A plan will not be confirmed based on a debtor's "hope against hope" that financing will

materialize. *Id.* (internal quotation omitted). Hope is all AMC has and all it has ever had.

Although the prospects for confirming a plan are not evaluated as stringently early in a case as they are later on, a debtor facing a motion under section 1112(b) must still show that a reorganization is plausible and not "a mere financial pipe dream." *Ramreddy*, 440 B.R. at 115 (internal quotation omitted). With no financing available, and no other means of reorganizing suggested, AMC has not made that showing. The lack of a reasonable likelihood that a plan will be confirmed is additional "cause" to convert or dismiss the case. *Bartle*, 560 F.3d at 730.

### c. Exceptions to Dismissal or Conversion

Because the Bank has unquestionably demonstrated "cause" under section 1112(b)(1), conversion or dismissal is mandatory unless AMC has met its burden to establish the exceptions in section 1112(b)(2). *In re McTiernan*, 519 B.R. 860, 864 (Bankr. D. Wyo. 2014); *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); *In re Van Eck*, 425 B.R. 54, 58 (Bankr. D. Conn. 2010).

AMC has not. No "unusual circumstances" have been "specifically identified" indicating that neither dismissal nor conversion would be in the best interest of creditors and the estate. 11 U.S.C. § 1112(b)(2). This case involves no "conditions that are not common in most chapter 11 cases." *Wallace*, 2010 WL 378351, at *7. The circumstances here are in fact all too common, the kind "encountered by the typical debtor operating in a Chapter 11 proceeding," *In re Products Int'l Co.*, 395 B.R. 101, 112 (Bankr. D. Ariz. 2008): a debtor that has failed to file operating reports and that needs, but has no prospect of obtaining, post-petition financing. Nothing about the case suggests that the Code's purposes would be "better served by maintaining the case" in chapter 11. *In re Fall*, 405 B.R. 863, 871 (Bankr. N.D. Ohio) (internal quotation

-16-

omitted), *aff'd*, Nos. 3:08CV3012, 3:09CV304, 2009 WL 974538 (N.D. Ohio Apr. 9, 2009). If this case has something unusual about it justifying its continuation in chapter 11, it was up to AMC to say so. AMC is silent on the subject.

Because AMC has identified no "unusual circumstances" that might support denying the Bank's motion, the other exceptions in section 1112(b)(2) need not be discussed.[9] The case must either be converted to chapter 7 or dismissed.

### d. Conversion or Dismissal

The only remaining question is whether dismissal or conversion is appropriate. The question is a close one, but on balance conversion appears to be the better course – even though the Bank urges dismissal. *See In re Del Monico*, No. 04 B 28235, 2005 WL 1129774, at *3 (Bankr. N.D. Ill. May 13, 2005) (noting that the court can choose to take either course no matter which one the movant has sought).

Whether a chapter 11 case should be dismissed or converted depends on what is "in the best interest of creditors and the estate." 11 U.S.C. § 1112(b)(1). In deciding what will best serve those interests, courts often consider a long list of factors. *See, e.g., In re Green Box NA Green Bay, LLC*, 579 B.R. 504, 511 (Bankr. E.D. Wis. 2017); *In re Westhampton Coachworks, Ltd.*, Nos. 09-73008-ast, 09-73009-ast, 2010 WL 5348422, at *6 (Bankr. E.D.N.Y. Dec. 21, 2010); *Ramreddy*, 440 B.R. at 115. Too often, though, those factors prove either neutral or inapplicable, making the multi-factor analysis unhelpful. *See, e.g., Green Box*, 579 B.R. at 511.

Better than a multi-factor test is a general principle: creditors are generally "best served

---

[9] Because the Bank has demonstrated that AMC is in fact not reasonably likely to confirm a plan, no showing to the contrary – that a plan is likely to be confirmed – is even possible. *See Attack Props.*, 478 B.R. at 345 (making this point under identical circumstances).

-17-

by the course of action that results in the largest number of [them] being paid the largest amount of money in the shortest amount of time." *Rey*, 2006 WL 2457435, at *9; *see also Del Monico*, 2005 WL 1129774, at *3. The best interest of the estate turns on whether its economic value "is greater in or out of bankruptcy." *Rey*, 2006 WL 2457435, at *9; *Del Monico*, 2005 WL 1129774, at *3. A "key question," then – perhaps *the* key question – is "what assets would be available for a chapter 7 trustee to liquidate and administer for the benefit of unsecured creditors if this case were converted?" *Green Box*, 579 B.R. at 511.

With this question in mind, the decision becomes simpler. When the estate has no assets with equity a trustee could liquidate to pay unsecured creditors, dismissal is in the best interest of creditors and the estate. *See, e.g., Fall*, 405 B.R. at 871 (finding dismissal proper "given the lack of any substantive evidence that substantial equity exists for the estate as a whole"); *In re Northeast Family Eyecare, P.C.*, No. 01-13983DWS, 2002 WL 1836307, at *6 (Bankr. E.D. Pa. July 22, 2002) (same); *In re Marsh Fairway Corp.*, 148 B.R. 721, 723 n.2 (Bankr. D. Conn. 1992) (same). When there are estate assets with equity, on the other hand, conversion is the better course. *See, e.g., In re Burgess*, No. 11-1257, 2013 WL 5874616, at *3 (Bankr. N.D. W. Va. Oct. 30, 2013) (finding conversion in the best interest of creditors because of "equity in several parcels of real property"); *In re Tri-Chek Seeds, Inc.*, No. 12-11409, 2013 WL 636031, at *5 (Bankr. S.D. Ga. Feb. 7, 2013) (same).

Whether to dismiss or convert the case is a decision entrusted to the bankruptcy court's discretion. *Ramreddy*, 440 B.R. at 115. That discretion is broad. *Northbrook Loans, LLC v. BlackAMG*, 555 B.R. 680, 682 (N.D. Ill. 2015).

The equity question in this case is less than clear, but what little evidence there is suggests that AMC's facility may have substantial equity. AMC's initial schedules gave a value

-18-

for the facility of $10 million, and that figure increased in the amended schedules to $16 million. Against the Bank's $8.4 million debt (along with a real estate tax debt scheduled as $120,000), the values from the schedules show equity of either $1,480,000 or $7,480,000 – easily sufficient to warrant administration in chapter 7. As evidence of value, this is admittedly pretty thin stuff. But at least it is something – and the Bank offers nothing to call it into question, just the unsupported conclusion that the Bank is "most likely" the only creditor who will be paid. (Mot. at 12; Reply at 14). In the absence of better evidence, the schedules are enough to support conversion to chapter 7. *Cf. Napolitano v. Joseph (In re Joseph)*, Nos. 06-30244(LMW), 06-3167, 2007 WL 3355379, at *4 (Bankr. D. Conn. Nov. 8, 2007) (relying on the schedules, in the absence of other evidence, to determine the value of fraudulently transferred property).

It is true, as the Bank observes, that certain aspects of this case arguably favor dismissal over conversion. The AMC facility is the only significant asset in the estate, and that asset is currently in the hands of a receiver. Conversion to chapter 7 would simply substitute a new custodian (a trustee) for the current one. The Bank is also the sole creditor that has participated significantly in the case, and of the three creditors that have participated at all (the other two are the SEC and Meridian) only the Bank has expressed a preference.[10] That preference is dismissal. Because creditors are "the best judges of what is in their own best interests," when creditors agree the court should ordinarily accommodate their wishes. *Rey*, 2006 WL 2457435, at *9.

Still, with some indication that the AMC facility could have significant equity to pay unsecured creditors, the prudent course is to convert the case rather than dismiss it. A chapter 7 trustee has greater powers than a receiver and has duties to creditors receivers do not have.

---

[10]  In fact, the Bank is the only party in interest that has expressed a preference. AMC has not weighed in. Neither has the U.S. Trustee.

Conversion will allow a trustee to investigate whether a sale of the facility would indeed produce a significant dividend for AMC's unsecured creditors. From the Bank's point of view, the resulting delay from a conversion should be minimal. If the trustee concludes a sale is not worthwhile, a "no distribution" report will be filed, the case will close, the property will be deemed abandoned, and the Bank will be free to pursue its remedies in the state court.

### 3. Conclusion

The motion of West Suburban Bank to convert or dismiss this chapter 11 case is granted. The case is converted to a case under chapter 7. A separate order will be entered consistent with this opinion.

Dated: September 27, 2018

_____
A. Benjamin Goldgar
United States Bankruptcy Judge